Thank you, Your Honors. May it please the Court, Ben Widlansky of Kozak-Tropen and Brock-Morton for the Plaintiff's Appellants. Banks can aid in a bet fraud. Under the law of this circuit, set forth in White, Lerner, and other cases, when a plaintiff alleges facts that support a strong inference that a bank has actual knowledge of and substantially assists a fraud, the plaintiff has successfully alleged that the bank aided and abetted that fraud. And to tell them lore-wise, the Court views allegations in their totality to determine whether the standard is met, not each fact in isolation. In this case, we've pled detailed facts giving rise to a strong inference that the banks had actual knowledge of the fraud. The District Court erred by failing to consider those facts in their totality and by failing to draw the required inferences in our favor from those facts. We allege that Darlene Cunningham, a branch manager at Bank of America and later Citizens Bank, was a knowing and essential participant in the individual defendant's Ponzi scheme, responsible for maintaining the engine of the fraud through lies to American Express and eventually extracting payment from the individual defendants for doing so. How did she know what she was a part of? We detailed that she knew the defendants solicited and took in funds from investors, that she helped shuttle and commingle the funds around more than 100 accounts, and that she knew the individual defendants were stealing investor funds. We allege that she knew that account balances regularly dipped near or to zero. Cunningham opened well over 100 accounts during her time assisting the fraud, many of which she opened on her own and without requiring a signature or even a request from the defendants. She lifted freezes on large deposits to make sure the money continued to flow. And she was the day-to-day contact for all the schemes banking transactions. These facts give rise to a strong inference of the bank's knowledge of and assistance with a scheme to defraud investors. Cunningham was an active and essential participant in this scheme. The individual defendants funded the day-to-day expenses for the scheme through Perry Santillo's personal Amex card. And Cunningham facilitated the scheme by repeatedly lying to Amex in order to keep the scheme's main line of credit flowing. For example, on one occasion out of many over the years, Cunningham acting at Santillo's request and with his explicit instructions told Amex that Santillo's account had more than $950,000 in it, when in actuality his account had less than $20,000. Cunningham's knowledge that she was engaged in assisting the scheme to defraud investors is further evidenced by the fact that she took a quote-unquote loan from them to lie to Amex. This loan with no terms, no memorialization, and which of course was never repaid, was understood by Cunningham's lies to Amex. It was solicited by Cunningham as a condition before continuing to lie. They bribed her, she lied, and the fraud continued. This is knowing and substantial assistance. The totality of the allegations described in the complaint, allegations which, as Judge Lynch stated in the Winnick case, shade in the contours of Cunningham's state of mind, create a strong inference of actual knowledge and satisfies our pleading burden. Are we, is it a strong inference of actual knowledge as to the underlying fraud or strong inference when you, clearly she knew about the deception of American Express, but what is there in the complaint other than that she opened a large number of accounts and transferred funds that suggests she knew about the specifics of the underlying fraud or its character? Yes, Your Honor. We allege in the complaint that Cunningham understood the business model, that she knew that the money was shuttled around and commingled across the various accounts, that she regularly lifted checkholds on large deposits so that she could allow the money to move freely and maintain the liquidity necessary for the Ponzi scheme to continue. Well, but Mr. Woodlansky, this is Judge Lynch. As far as the allegation that she knew their business model, that seems to me to be entirely conclusory, right? I mean, it doesn't say what the business model was. And interestingly, in paragraphs 42 to 60 of the complaint where you outline what the scheme was, there's not a single allegation referencing Cunningham or her knowledge of any of that scheme. So what you've got, it seems to me, and what you've just said is an allegation that a bank officer opens a lot of accounts for people and then facilitates their transferring money between those and among those accounts. But that doesn't say that she knew why they were moving those funds or what was illicit about it, right? Well, Your Honor, I would say that the fact that she made this lie to American Express over and over and over is evidence of her state of knowledge. Well, that would be great if you were representing American Express. If American Express says we were defrauded because we wound up lending money that never got repaid based on representations from the bank that the recipient of the money was or the person charging these fences was solvent, that would be certainly something that she aided and abetted. But what connects that? I understand what connects it in the abstract, what role American Express cards played in the scheme. But how does that say that Ms. Cunningham knew about the defrauding of investors? Your Honor, the lies to Amex are evidence of her state of mind of the overall scheme, as is the solicitation of the bribe. The fact that she was engaging in all of these other activities while at the bank, that shows what she knew. In any case where you are trying to establish the knowledge of an aid or abettor or a co-conspirator, you can only do so through the acts that they undertake. We can't open up those... Excuse me, the acts that you're referring to are acts related to American Express and to defrauding American Express. And the question I'm asking is what in any of the complaint alleges or supports an inference that she actually did understand their business model, which is to say that she knew that they were taking and running a Ponzi scheme, basically. Well, we realize that she was the day-to-day contact for all of the banking transactions. And the banking transactions that we outline in depth in our complaint show that the money was being shuttled around, commingled, and withdrawn by the individual defendants for their personal use. The Amex lies, Your Honor, we're not alleging that Darlene Cunningham is guilty of fraud and the Bank of America in abetted that fraud because the lie to Amex is fraudulent. What we're saying is that the lies to Amex and the bribe later are evidence of her state of mind. Which is that she was intentionally lying to Amex to assist these people in not paying their bills to Amex, I guess. Yes, Judge, but also because we allege that she knew that the Amex was the engine of the fraud, that it was the main line of credit. It's the main line of credit, excuse me, it's the main line of credit of the defendant's business, right? I mean, but what, so suppose they were running a completely legitimate business, but were short of capital, and the bank or the bank officer facilitates their maintaining a line of credit with American Express. That defrauds American Express, but what says that she understood that the business that she was keeping afloat that way was a criminal enterprise? That's what I'm looking for. Judge, I think it's the totality of the circumstances and the allegations outlined in the complaint. The fact that she lied to Amex, it needs to be looked at through the prism of the light most favorable to the plaintiffs at this stage of the case. We are entitled to inferences drawn in our favor, and the inference that she lied to Amex, the allegation that she knew the Amex was the engine of the fraud, that she knew that without the Amex, the fraud would collapse. No, no, no, you see, excuse me, Mr. Williams, you keep saying the same thing, and I think I'm not making myself understood. She knew that the Amex line of credit was the engine of the business, and she lied to American Express to keep the business running, and what I'm looking for, you keep saying the engine of the fraud. What is there that says that Ms. Cunningham understood that what they were doing was defrauding investors? We allege that Perry Santillo, through his interactions with Darlene Cunningham over the years, stated that she knew what they were doing, that she knew the character and nature of their business as your- Wait, Santillo says that she knew that they were defrauding investors? Is that an allegation of the complaint? If that's what you just said, is that an allegation of the complaint? No, Your Honor, Santillo said that she understood the business model. That's what Santillo said, and that's what's in the complaint. I see. And that's at paragraphs 4 and 92 in the complaint, Your Honor. And when you take that allegation together with the specifics of how the fraud was conducted, and the fact that Darlene Cunningham took substantial steps to lift the checkholds, through the shuttling of the money around, and through the lies to Amex. And I think it's important, Your Honors, not just to look at the lie to Amex in isolation. It must be viewed through the prism of, she also requested a bribe. She wasn't just doing this because she wanted these guys' legitimate business to continue. She was doing it, and she knew that she had leverage to do it because it was fraudulent. If it wasn't- Mr. Wilansky, your time has expired. Would you like to use some of your rebuttal time now, or reserve it? I will reserve it, Your Honor. Thank you. Thank you. We'll hear from the Bank of America. Thank you, Your Honor. Anton Matlitsky from Bank of America, and may it please the Court. The decision below should be affirmed for many reasons, but maybe the most obvious is that not constructive knowledge, but actual knowledge of the Ponzi scheme the individual defendants perpetrated. Even after filing two Florida complaints, receiving 4,000 pages of discovery, and even interviewing the leaders of the Ponzi scheme, Plaintiff's complaint still does not include any factual allegations that anyone at Bank of America, not Darlene Cunningham or anyone else, knew of that Ponzi scheme. Now let's start with what they don't allege. They don't allege that Cunningham or anyone else knew the principal facts underlying the Ponzi scheme, as Judge Lynch pointed out. There's no allegation that Cunningham knew that the individual defendants provided their clients fraudulent material, falsely promising fixed returns, and lying about investments. There's no allegation that Cunningham knew that they misrepresented the performance of investments for their clients. There's no allegation that Cunningham knew that they used new funds to repay existing investors or to pay themselves. In other words, just as in Judge Pierce's opinion in Chris, there's no allegation that Cunningham knew any of the general details of the Ponzi scheme. What they do allege is crystallized on page four of their reply brief and amounts mostly to ordinary banking activity and also includes conduct that might demonstrate actual knowledge of wrongdoing targeted at American Express, but not knowledge of a Ponzi scheme or any other fraud targeted at plaintiffs, which is what this court's precedents such as Lerner and Defendants, who are alleged to have been one of her biggest customers. There's obviously nothing out of the ordinary about that, and there's nothing out of the ordinary about her calling them to see if they wanted to open more accounts. That's just what a branch manager does. Second, they allege that Ms. Cunningham routinely lifts holds on accounts after large deposits, which again, they don't allege is anything different than what a bank branch manager would do for one of her biggest clients. There's no way other than through hindsight or just a wild guess for someone to look at those allegations and conclude that a Ponzi scheme was happening. Now, the last allegation is that Ms. Cunningham called American Express and told Amex that the individual descendants had sufficient funds to warrant their line of credit when that was not true, and after she left the bank, she asked for a quote-unquote loan of $40,000 to keep making the calls. Again, that might suffice to demonstrate actual knowledge of wrongdoing directed at Amex, and we'd have a much harder time arguing if Amex were suing for aiding and abetting wrongdoing against them as to the actual knowledge element, but it doesn't give rise to any reasonable inference, let alone a strong inference, that they were running a Ponzi scheme against the plaintiffs, which again is what the court's reference is. Mr. Metlinsky, this is Judge Lynch again. Mr. Wetlansky cited Paragraph 4 of the complaint, which alleges that Santillo said that Cunningham understood that the defendants solicited investments from people, deposited the investments into their accounts at Bank of America, and then shuttled money through the accounts, with some of the money going to the individual defendants' personal accounts through cash withdrawals and personal checks. How close does that come to knowing that, certainly nothing here suggesting that any of the money went from those accounts to investments of some kind, is there? Well, I don't think it comes close at all, Your Honor. First of all, in MLSMK against J.P. Morgan, this court held it not unusual for money I'm quoting, it is not unusual for money to be transferred into and out of investment accounts, or else investment advisors did not buy insurance securities on behalf of their clients. And of course, investment advisors also pay themselves, or take a percentage of account assets. So none of that strikes me as even unusual. But even if it were unusual, somebody looking at that wouldn't say, oh, wow, I actually know that they're running a Ponzi scheme, right? And that's really the question. That's really what the allegation, there has to be a strong inference that they're actually running a Ponzi scheme, not that they're doing something untoward. Again, that allegation doesn't seem to me to even demonstrate anything untoward. But for example, Is it actual knowledge of the overall contours of the fraud? I mean, how much how much does she have to know before we say there's a plausible allegation here of actual knowledge of an underlying fraud? So at the very least, she would have to know the general architecture of the underlying fraud. For one thing, she'd have to know that there was a fraud directed at the plaintiffs. I think that this court's precedents also made clear that she'd have to know just generally that a Ponzi scheme was happening. I'm not suggesting she'd have to know every single detail of the Ponzi scheme, but at least that it was a Ponzi scheme. I mean, if you look at a case like Rosner from this court, where the defendants knew that money laundering was happening, but didn't know that the particular fraud directed at the plaintiffs in that case was happening, and that wasn't enough to get past the pleading. Or take Lerner, where the court expressly stated that the aiding and abetting defendant there knew of wrongdoings committed by the individual defendant there, but didn't know of the actual fraud happening, which was just the looting of attorney accounts, attorney's client funds. And the court held that was not enough to demonstrate a strong inference of actual knowledge. I think what's crucial about all of this is that one of the reasons that actual knowledge has to be alleged in detail and requires a strong inference, including actual knowledge of the general architecture of the scheme, is that otherwise it's very easy to allege these kinds of cases in hindsight. Right? Once you know that there was a Ponzi scheme happening, you can start piecing all sorts of secondary facts together to demonstrate how those facts might have fit into a Ponzi scheme. But if all you know is those secondary facts, like opening up a lot of accounts, and even lying to American Express about account balances, nobody would ever say, I know those facts and thus I actually know, not even should have known, but actually know that a Ponzi scheme was happening. Right? That's why the court held in crisp that a defendant in this kind of case, quote, should not be called to account for the intentional fraud of another, unless the circumstances of his connection therewith can be alleged in detail from the outset. And in that case, the failing in the complaint was that there were no allegations of the actual details of the underlying fraud. There were just conglomerate allegations that the defendant knew of the fraud. And just how about here, how about here, how about here, allegations that, I mean, I think that the vouching to American Express is some circumstantial evidence that the individual defendants are engaged in propriety. And then there's the allegation that they, she was generally aware of the business they were in, their business model, whether it's improper or not, she knew that they were soliciting funds from investors. And then there are a large number of accounts being opened and large numbers of movements of funds. That's not enough to just get to the level of plausibility? For sure not, Your Honor, because all of those facts that you just noted are just normal activity for a large investment advisor. A lot of accounts is something that a large investment advisor- Well, the Amex allegation is, the Amex allegation is not normal activity. No, no, that's true. But that allegation falls under the principle of cases like Lerner and Rosner, that knowing of impropriety is not remotely close to enough to satisfy this standard, which is actual knowledge of the actual underlying fraud. And I would just say, the allegation that Cunningham knew and understood their business model, that's paragraph 92, it says from the earliest years of their relationship. And they also allege that from the earliest years of their relationship, they were running a legitimate investment advisory practice. So the fact, as Judge Lynch pointed out, there are a lot of different reasons why somebody would want to get extra credit and even lie to their creditor that doesn't suggest, even remotely suggest, the Ponzi scheme or even any other kind of impropriety. They could just be low on funds, right, running their legitimate business. Or it could just, it was a credit card, right, so it could have nothing at all to do with their business. They might just want to buy expensive cars or something like that. Looking at those allegations, other than in hindsight or just as a pure, pure wild guess, you couldn't possibly actually know of the Ponzi scheme. And again, I would point the court to Judge Kearse's opinion and Chris, because it was the same thing. There were sort of conclusionary allegations that the legislators and embedders knew of the fraud, but there was no allegation that they knew of the actual details of the fraud. And in this case, the details of the fraud, as Judge Lynch pointed out, are between paragraphs 44 and 62. It's the, you know, giving their investors false documents and pretending they made investments that they didn't make and guaranteeing returns and, you know, using new investment funds to pay off old investors. That's the Ponzi scheme. And there's no allegation that Ms. Cunningham or anyone else at Bank of America knew about it. Thank you. We'll hear from your colleague, Mr. Michael. Good morning. May it please the court. In the interest of time and my time with you is brief today, I'm going to join in the arguments, the ground that Bank of America has already plowed. I'm going to join in that plowing and I'm going to focus our short time together on the imputation arguments that have been advanced by the appellants. We've already talked about sort of the operative facts, the line to Amex and the loans and doing things that were against bank policy in terms of lifting deposits on low zero negative balance accounts or opening accounts. As a threshold matter, the district court going along with Judge Lynch's questions, the district court didn't find that Cunningham had actual knowledge. And we, of course, argue that she didn't. But let's assume that Cunningham had actual knowledge. She was not acting within the scope of her employment. And there's an awful lot of cases in this circuit that say that the employer is not liable, whereas here are no evidence that the bank induced or otherwise approved of the employee's conduct. And Cunningham was not acting in the interest of her employer. None of these these smattering of facts would be in the interest of either bank, frankly. And the real Jenga moment, the real moment where you pull the pin and the facts fall to the ground is that the appellants admit that Santillo knew that there was something that Cunningham had to hide. And that's on the brief pages, their brief, 26 to 27 complaint, paragraph 96, appendix page 38. And those quotations are important. Cunningham had to, quote, run interference after each bank investigation to find out. And that's the end quote. And to find out if the schemers, quote, were all right, quote, close quote. And that's Santillo's language. And they can't have it both ways. You can't be acting in the best interest of the bank on the one hand and acting in the scope of your employer. And on the other side of the coin, actively deceiving your employer. And there are obviously cases that we've cited that say banks are not liable for the actions that are solely based on the personal motives and not in furtherance of the bank's business. And briefly, agency, there is agency just doesn't apply the situation on the facts. And obviously, we cite cases on that. And, you know, really, I'm struck by the words of Judge Larimer when he said, and I couldn't say it better, it's well settled in the Second Circuit that a bank's negligent failure to identify warning signs of fraudulent activity, such as atypical transactions, even where such signs converge to form a veritable forest of red flags, is insufficient to impute actual knowledge of ongoing fraud. And he cites Lerner and Rosner. And that's important in closing, because one of the allegations in the appellant's brief mischaracterizes the proceedings below. And they allege that the district court did not consider imputation of Cunningham's knowledge. I just read you one of many passages where the judge did consider it, didn't accept the arguments advanced by the appellants in this case. But I couldn't have said it better than Judge Larimer myself. Thank you. Thank you, Mr. Michael. We will hear rebuttal. You may have to leave the court. Thank you, Your Honors. Darlene Cunningham can be presumed to know they were defrauding investors, in addition to Amex, because they were shuttling money around with account-to-account, no legitimate business purposes, and using it for themselves while lying to Amex. And the logical inference of that, which we are entitled to at the motion-to-dismiss stage, is that they were defrauding investors and she knew it. The bank can present other theoretical inferences, but that is not, as Judge Lynch, as you noted in Winnick, that's not for the motion-to-dismiss stage. That's for later in the case. And the one thing that we didn't hear a lot from either of the banks is the discussion of the bribe. And that's because the bribe in this case makes it different than all the other cases cited. There is no case cited where there are allegations that a bribe was paid directly to a bank insider by a fraudster and the case didn't survive a motion-to-dismiss. The bribe doesn't illuminate her knowledge of the nature of the lie to Amex about how much money they had in various accounts and that they needed her assistance. She could solicit money for that. But that doesn't say anything more about her knowledge of the character of the underlying fraud. Or maybe it does. Help me understand. Yes, Your Honor. I think it does, first of all, because as Judge Lynch said in Winnick, it shades in the concourse. All of these things have to be taken together and looked at together. It's got to be a totality examination. And the lie right before she was due to make this call means that she knew there was something going on. And because of all of the other things that she was involved in, it shows that she knew there was a fraud going on. And to answer one of your questions, Your Honor, that you asked my colleague from Bank of America, we don't need to allege that she was specifically involved and aware of every detail of the scheme. There are a number of cases relating to this in other circuits. There's no directly on point case in the Second Circuit. But under conspiracy law, as an analogy, criminal conspiracy, the individuals involved don't have to be aware of every detail. They have to know the character. They have to know the general theme. And certainly here, we have alleged enough at the motion to dismiss stage to show that Darlene Cunningham did. There was no dismissal. Mr. Woodlansky, would you care to respond briefly to Mr. Michael's argument, which seems to me a somewhat ironic one, that the bribe actually undercuts your case because that shows she was in this for herself and not in it for the bank? Certainly, Your Honor. And thank you. Agency law is pretty clear, as is the vicarious liability in this circuit, that unless the insider has totally abandoned the interest of the bank, a mixed motive is still enough to impute her actions and knowledge to the bank. There's a number of cases about that. I would point your honors towards the Bank of China case. The cases cited by citizens are in a very different context. Goldstein, for instance, is a Federal Court Claims Act case. It's got almost nothing to do with this. So the fact that she was doing things that were, and we've alleged in our complaint, accruing to the benefit of her employers, even if not totally accruing, right, because she certainly had a personal financial stake in the outcome of the fraud. But the fact that she was doing things that maintain economic value to her employers is enough to get us over the hump of mixed motive. The imputation issue also, by the way, is purely a question of fact. And there's a number of cases that talk about how imputation is a factual issue. The Bank of China, Buckley v. Deloitte, the Baranti financial case, the FDIC v. Ernst & Young from the Fifth Circuit. So if imputation is where the banks want to fall, I would suggest, Your Honors, that we should not be resolving that at a motion to dismiss stage. And additionally, we've acknowledged that the knowledge and acts of Darlene Cunningham should be imputed to the bank. Thank you, Mr. Wudlansky. We'll take the matter under advisement, very nicely argued by both sides. Thank you very much. Thank you. Thank you, Your Honor.